UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KEVIN TIMBROOK,                          )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )        No.   2:14CV009 TIA
                                         )
CAROLYN W. COLVIN, Commissioner          )
of Social Security,                      )
                                         )
                        Defendant.       )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is on appeal from an adverse ruling of the Social Security Administration.

The suit involves an application for Disability Insurance Benefits under Title II of the Social

Security Act.  Claimant has filed a Brief in Support of his Complaint; the Commissioner has filed a

Brief in Support of her Answer. The parties consented to the jurisdiction of the undersigned

pursuant to 28 U.S.C. § 636(c).

I.      **Procedural History**

On September 13, 2010, Claimant Kevin Timbrook filed an Application for Disability

Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq. (Tr. 131-37).[1]  Claimant

states that his disability began on March 15, 2010, as a result of seizures, vision problems, a right

temporal lobe cyst, nausea, confusion, depression, shortness of breath, chest pain, and fatigue.

(Tr. 73).  On initial consideration, the Social Security Administration denied Claimant's claims for

benefits.  (Tr. 65-70).  Claimant requested a hearing before an Administrative Law Judge

_____
[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer
(Docket No. 12/filed March 18, 2014).

("ALJ").  On October 19, 2012, a hearing was held before the ALJ who issued an unfavorable

decision on November 15, 2012.  (Tr. 8-26, 34-61).  The Appeals Council on December 11, 2013

found no basis for changing the ALJ's decision and denied Claimant's request for review of the

ALJ's decision after considering the brief of representative.  (Tr. 1-5, 213-18).  The ALJ's

determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on October 19, 2012

At the hearing on October 19, 2012, Claimant testified in response to questions posed by

the ALJ and counsel.  (Tr. 35-58).  At the  time of the hearing, Claimant was fifty-one years of

age, and his date of birth is February 8, 1961.  (Tr. 39).  He stands at five feet eleven inches and

weighs 180 pounds.  (Tr. 40).  He is right-handed, and he completed the tenth grade.  His wife

works as a CNA in a nursing home. (Tr. 40).

Claimant testified that he last worked in 2010 for Spherion, a temp service out of

Columbia, for two months.  (Tr. 41).  The last time he did any kind of lawn work was in the

spring of 2010.  (Tr. 41).

In January 2010, Claimant had a seizure, and he received treatment in the emergency room

at Samaritan Hospital.  (Tr. 42).  The doctor found a cyst on his front temporal lobe.  He has not

felt the same since the initial seizure.  Claimant explained how he feels spacey all the time, loses

his balance, and feels lightheaded.  (Tr. 42). He can sit for thirty to forty minutes before he loses

focus and his mind wanders.  (Tr. 43).   Claimant testified that he does not feel safe doing

anything because of his seizure activity.  (Tr. 49).

Before the episode, he did not have any problems focusing and concentrating.  (Tr. 43).

He experiences constant lightheadedness, and he sometimes has problems with his balance. (Tr. 45). Three months earlier, Claimant started experiencing daily, pulsating headaches causing him to feel nauseous. (Tr. 46, 54). His doctor prescribed a different medication, Neuronic, for the pain the day before the hearing. (Tr. 47). He also takes anti-seizure and anti-anxiety medications. Claimant testified that he no longer feels safe doing what he use to do such as running equipment climbing a ladder. (Tr. 47). His diagnosis of bilateral, noise-induced hearing loss does not prevent him from using the telephone. (Tr. 55).

Although Claimant testified that he constantly experiences a spacey feeling, the ALJ noted Claimant had been able to focus and answer the questions asked at the hearing. (Tr. 56). He testified that he experiences spacing out to the point where he cannot focus and is confused more than fifteen times each day. (Tr. 56).

After consuming two bottles of Jim Bean, Claimant received treatment in the emergency room for possible alcohol poisoning. (Tr. 58).

Claimant testified that he goes outside and checks his mailbox every day. (Tr. 47). Two to three times a week he goes and checks on his rental of properties, goes see family, or goes to the store. (Tr. 47). Due to lack of funds, he has not been able to work on the properties for six to eight months. (Tr. 48). Claimant testified how he moved a 24' by 33' home on beams to a piece of property using hydraulic jacks with cribbing. (Tr. 49). He explained how he has worked on the project for a year and has not yet completed it. (Tr. 49). He likes to walk on a walking trail in a ballpark close to his house. (Tr. 48).

Although his doctor found driving not to be a problem for Claimant, he does not drive because he does not feel safe. (Tr. 51-52). The ALJ noted that his doctor did not place a

restriction on his driving in the seizure questionnaire. (Tr. 52). Claimant testified that although his doctor did not actually tell him he could not drive, his doctor suggested that he not run any type of equipment. Claimant testified that he has to lie down once or twice a day for an hour or two depending on how he feels. (Tr. 52).

### 2. Testimony of Vocational Expert

Vocational Expert Kenneth Ogren testified in response to the ALJ's questions. (Tr. 58-61, 120). Mr. Ogren testified that he was familiar with the jobs existing in the state of Missouri. (Tr. 58). Mr. Ogren described Claimant's last work as a general laborer, semi-skilled and heavy for DOT and a part-time lawn cutting, semi-skilled and medium. (Tr. 59).

The ALJ asked Mr. Ogden to assume that

an individual with the Claimant's age, education, and work experience, who is limited to the full range of light, exertional work, as defined in the regulations. Limited to occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling.... Such an individual us – must avoid concentrated exposure to excessive noise; must avoid all exposure to hazards, such as operational control of moving machinery and unprotected heights; must avoid commercial driving. Such an individual is limited to occupations that do not require fine hearing capability, and is limited to no more than frequent telephone communication. Such an individual is limited to simple, routine, and repetitive tasks. Could such an individual return to the past jobs you testified to?

(Tr. 59). Mr. Ogden responded no. (Tr. 59).

Next, the ALJ asked if there were other jobs in the national economy such an individual could perform? (Tr. 59). Mr. Ogden listed the following jobs: bench work, a light level and unskilled with 4,900 jobs in Missouri and 288,000 available nationally; polisher, an unskilled job, with 2,200 jobs in Missouri and 524,000 available nationally; and an assembler, a light level job and unskilled, with 4,900 jobs in Missouri and 280,000 available nationally. (Tr. 60). Mr. Ogden

opined that these jobs were just a sample of jobs that would be available based on the

hypothetical.  (Tr. 60).

Next the ALJ asked Mr. Ogden the following:

assume an individual the Claimant's age, education and work experience.  We're
going to add to the hypothetical one, superficial interaction with the public an d
with co-workers.  Does that change your testimony as to past work or other work?

(Tr. 60).  Mr. Ogden responded no noted that other work would still be available in the same

numbers.  Mr. Ogden explained that employers' tolerance for an employee to be off task during

the work period is no more than ten percent, and employers customarily tolerate one day a month

for unexcused or unscheduled absences.  (Tr. 60-61).

### 3.  Forms Completed by Claimant

In the Function Report Adult - Third Party completed on September 25, 2010 by Sharon

Timbrook, his wife, she noted his daily activities include reading and watching television, and

taking care of some of the household chores.  (Tr. 161).  He also takes care of animals by feeding

and providing water.  (Tr. 162).  Ms. Timbrook noted that Claimant does the dishes, sweeps the

floors, does some yardwork, and prepares his meals when she is at work.  (Tr. 163).  He gets

around by either walking or riding in a car.  (Tr. 164).  He enjoys gardening.  (Tr. 165).

In the Function Report - Adult, Claimant reported after eating breakfast, he feeds the pets,

checks the mails, does various chores, and straightens up around the house.  (Tr. 169).  For short

distances, he walks with his wife.  (Tr. 169).  He walks daily for exercise.  (Tr. 172).

On March 1, 2011, Ms. Timbrook answered interrogatories on behalf of Claimant.  (Tr.

198).  She noted that Claimant cannot work due to seizures.  (Tr. 198).

## III.     Medical Records and Other Records

To obtain disability insurance benefits, Claimant must establish that he was disabled within the meaning of the Social Security Act not later than the date his insured status expired - March 31, 2012.  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.

On February 15, 2010, Claimant presented at the emergency room at Samaritan Hospital complaining of depression of two years and experiencing tightness in his chest and shortness of breath.  (Tr. 238, 240).

Claimant presented in the emergency room at Boone Hospital Center complaining of palpitations, nausea, slight shortness of breath, and a funny sensation in his chest.  (Tr. 297).  The February 16, 2010 echocardiogram revealed normal left and right ventricular size and systolic function.  (Tr. 295).  Claimant reported being anxious to be discharged inasmuch as there was no one at his home to keep the wood stove going or to do his chores.  (Tr. 295).  Dr. Speedy listed in the impression section atypical chest discomfort, weakness, nausea, intermittent palpitations, and iron deficiency anemia.  (Tr. 298).  Dr. Spaedy decided to have Claimant admitted and arranged to get a stress test and echocardiogram.  (Tr. 298).  The MRI of his brain showed a small probable incidental finding of a cyst with the medial right temporal lobe and no evidence of an aneurysm.  (Tr. 307-08).  The echocardiogram showed normal left and right ventricular size and systolic function, abnormal left ventricular relaxation, and mild mitral regurgitation.  (Tr. 311-12).  Based on the treadmill test, Dr. Spaedy found Claimant to have good exercise tolerance and no angina or EKG changes with exercise.  (Tr. 313).  In the Cardiovascular Procedure Note, Dr.

Elliot estimated the ejection fraction to be 60 percent or greater. (Tr. 314).

On March 1, 2010, Dr. Sudhir Batchu completed a new patient evaluation to treat his spells of spacing out, nausea, and diplopia. (Tr. 275). Claimant reported he has not been feeling as well as expected for more than five years. He reported iron to be his medication and working for Con-Agra in lawn care services. (Tr. 275). The neurological examination showed his mood to be depressed and affect to be flat. (Tr. 276). Dr. Batchu listed spacing out spells, nausea, and diplopia, palpitations, depression, and temporal arachnoid cyst in the impression note. (Tr. 276).

The March 15, 2010 audiology evaluation showed a moderate high-frequency sensorineural hearing loss bilaterally consistent with his history of noise exposure. (Tr. 292).

In follow-up treatment on April 11, 2010, Claimant reported not having any more spells but not feeling right. (Tr. 274). Dr. Batchu noted he has possible sleep apnea, seizures, and right temporal cyst. (Tr. 274).

On April 25, 2010 after completing a sonogram, Dr. Batchu diagnosed Claimant with sleep apnea resulting in sleep fragmentation and Brady-arrhythmia. (Tr. 277). His medical history included snoring and excessive daytime sleepiness. Dr. Batchu recommended repeat sleep study for CPAP tiration. (Tr. 277).

In follow-up treatment on May 9, 2010 after a sleep study showed sleep apnea, Claimant reported experiencing fluttering and palpitations in his heart. (Tr. 273). Dr. Batchu increased his Trilepal prescription and ordered a second sleep study. (Tr. 273).

On July 11, 2010, Claimant reported still not feeling well and having a spell similar to initial spell being nauseated and having stomach problems, heart pounding and head not clear. (Tr. 272). Dr. Batchu switched his medication regimen from Trilepal to Topiramate and

discussed the possibility of renal stones. Dr. Batchu noted Claimant had possible complex partial seizures. (Tr. 272).

On July 16, 19, and 20, 2010, Claimant received treatment at Carol Timmons' Clinic. (Tr. 260-62). He reported having a cyst on his brain and incomplete seizures starting six months earlier. (Tr. 262).

On July 19, 2010, Claimant presented at the emergency room at Samaritan Hospital complaining increased visual disturbance, blurry vision, and increasing headache. (Tr. 219). He reported having a cyst on the right lobe of his brain causing him to have seizures. (Tr. 221). The CT of his head showed no acute intracranial process. (Tr. 226).

On July 20, 2010, Claimant received treatment at the Boone Clinic for vision loss. (Tr, 354). He returned on July 29 and reported some improvement in pain but vision still blurred. (Tr. 353). On August 31, 2010, he returned and reported doing so well but not 100%. (Tr. 352). Although he was scheduled to return for follow-up treatment two months later, he failed to call or show up for the treatment. (Tr. 351-52).

On July 20, 2010, Claimant presented in the emergency room of Boone Hospital Center complaining of vision loss and pain behind both eyes. (Tr. 289).

On July 20 and 29, 2010, Dr. Walters treated his acute glaucoma. He reported starting a new medication a couple days earlier, Dr. Walters questioned if the side effects could be from this new drug. (Tr. 252). In follow-up treatment, he reported some improvement in comfort but his vision is still blurred. (Tr. 254).

On August 1 and 24, 2010, Dr. Batchu treated Claimant for sleep apnea and possible complex partial seizures. (Tr. 270-71).

In the August 2, 2010 Polysomnography Report, Dr. Lodhi noted obstructive sleep apnea with good response to CPAP and significant improvement in almost all the parameters of sleep with the application of CPAP. (Tr. 266-67).

On August 12, 2010, Dr. Sahaya provided a second opinion for a "spell/seizure" as well as abnormality on MRI. (Tr. 320). Claimant reported symptoms starting five to six months earlier when he became nauseated, his heart started pounding, and he had shortness of breath. He did not have any confusion or loss of consciousness. (Tr. 320). He reported having these episodes on a weekly basis. (Tr. 321). Claimant reported being a landscaper/lawnmower by profession and owning his own business. (Tr. 322). Dr. Sahaya noted Claimant to have a normal neurological examination. Dr. Sahaya found Claimant to be conscious and well-oriented, and his language to be fluent. (Tr. 322). Dr. Sahaya reviewed his MRI of the brain and he noted the images show a right medial temporal cyst which is hyperintense on T2 with central hypodensity. Claimant reported feeling that his symptoms have decreased in intensity although not frequency since starting Lamictal. Dr. Sahaya decided to perform a MRI with and without contrast and seizure protocol with temporal lobe volumetric analysis and recommended Claimant continue with his current medications. Dr. Sahaya noted how Claimant would return for follow-up treatment once the testing is completed. (Tr. 323).

The August 31, 2010 MRI of his brain showed no change of small nonenhancing cyst adjacent to the right temporal horn of the right lateral ventricle, and continued mild T2 signal abnormalities in the periventricular white matter. (Tr. 286).

In the September 17, 2010 EEG Report requested by Dr. Sahaya, it was noted no ongoing run of rhythmic spike and wave activity seen and a possible cyst in the right temporal lobe. (Tr.

318).

On October 31, 2010, Nathan Kempker completed a Physical Residual Functional Capacity Assessment and listed right temporal lobe cyst, incomplete seizures, acute glaucoma, and sleep apnea as his primary diagnosis. (Tr. 327). Mr. Kempker found Claimant can occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, and unlimited in pushing and pulling. (Tr. 328). Mr. Kempker found Claimant should avoid concentrated exposure to hazards including machinery and heights. (Tr. 330).

In the November 4, 2010 Psychiatric Review Technique, Dr. Barbara Markway found Claimant has no medically determinable impairment. (Tr. 333-43). Dr. Markway noted the current medical evidence shows Claimant to be fully alert and oriented, and his neurological examination to be normal. (Tr. 343). Dr. Markway noted he has some initial dizziness, imbalance, and visual changes caused by glaucoma and noted these related impairments could definitely result in some confusion but the current evidence shows his symptoms to be significantly improved, (Tr. 343).

On November 18, 2010, Claimant was treated at the University of Missouri Health Care. (Tr. 356). Claimant reported recurrent episodes as sudden onset lightheadedness, panic, shortness of breath, feeling unsteady, and gastric discomfort. He takes Lamictal but his symptoms continue but are less intense. (Tr. 356). Dr. Sahaya opined his multiple of episodes raise suspicion of autonmic seizure. Dr. Sahaya noted Claimant his MRI shows a right medial temporal cyst, and he recommended a repeat MRI but this was not performed. (Tr. 357). He noted how Claimant has lost his insurance and has applied for disability. Dr. Sahaya opined that to

conclusively rule out seizures, he would need to perform CCTV EEG but this is not feasible without any insurance. Dr. Sahaya further opined that he has a strong suspicion of panic attacks giving atypical factors for seizure. Dr. Sahaya recommended management of panic attacks by primary care physician or psychiatrist and increased the dosage of Lamictal. (Tr. 357).

On January 14, 2011, Claimant presented in the emergency room at University of Missouri Health Care seeking treatment for balance problems, nausea, and dizziness starting four days earlier. (Tr. 359). Dr. Lanigar how Claimant is known to the neurology service and has been treated by Dr. Sahaya at an outpatient clinic for his seizures. (Tr. 363). A review of his systems showed everything to be negative except as noted. (Tr. 364). The neurologic examination showed Claimant to be alert and oriented. (Tr. 364). In the assessment, Dr. Lanigar noted possible seizures, possible medication side effects, and possible stroke-like symptoms. (Tr. 365). The MRI of his brain showed no acute enhancing lesion or mass and the right temporal lobe cyst unchanged or slightly smaller than study of April 16, 2010. (Tr. 367).

On March 14, 2011, Dr. Terry Ryan noted how Claimant is feeling better with his current regimen with Clonazepam and the CPAP and discussed the possibility of panic attacks causing his symptoms. (Tr. 390).

On October 1, 2011, Claimant received treatment at the Samaritan Hospital for possible alcohol poisoning. (Tr. 372-86, 392-401).

On October 11, 2011, Claimant reported dizziness and vertigo during treatment at the Carol Timmons Clinic. (Tr. 418). The neurologic examination showed negative Rhomberg, heel to shin negative, tandem gait negative, speech clear, and thoughts concise. (Tr. 420). On November 21, 2011, he returned and reported being diagnosed with incomplete seizures and

chronic vertigo.  (Tr. 414).  Claimant reported "[h]is lawyer has told him that he needs to go to

the Dr. every few months and be seen so his symptoms can be documented over time."  (Tr. 414).

He reported being abstinent from alcohol for two to three months and having pulsating headaches.

(Tr. 414).  Neurologic examination showed Claimant to be a little wobbly with heel to shin and

tandem gait and the Rhomberg.  (Tr. 416).  Dr. Timmons noted how he demonstrated the way he

can turn his head and have a vertiginous episode but he did not have one at the examination.  (Tr.

416).  Although Dr. Timmons recommended a medication for his blood pressure, Claimant

indicated he did not want to take a pill now, and he would try lowering his blood pressure by

walking.  (Tr. 417).

On December 11, 2011, Dr. Sudhir Batchu completed a Seizures Residual Functional

Capacity Questionnaire at the request of counsel.  (Tr. 80-85 346-49).  Dr. Batchu listed his

diagnoses as complex partial seizures, glaucoma, arachnoid cyst, sleep apnea, depression, and

anxiety.  (Tr. 82).  Dr. Batchu noted Claimant has complex, partial seizures on a not consistent,

variable basis, lasting a few minutes in duration.  (Tr. 82).  Dr. Batchu listed stress, headaches,

arachnoid cyst as precipitating factors and listed confusion, exhaustion, and severe headache as

postictal manifestations.  (Tr. 83).  Dr. Batchu did not respond to the question asking him to

describe the degree to which having a seizure interferes with Claimant's daily activities.  (Tr. 83).

Dr. Batchu noted that Claimant cannot work at heights or work with power machines.  (Tr. 84).

Dr. Batchu found Claimant can drive and his seizures would not likely disrupt the work of co-

workers.  (Tr. 84).  Dr. Batchu found Claimant to be incapable of performing low stress jobs.

(Tr. 85).

On January 27, 2012, Claimant returned for an influenza shot.  (Tr. 412-13).  On March

27, 2012, he returned for a review of his neurological seizure activity. (Tr. 408). Claimant reported being under the care of Dr. Batchu. (Tr. 408). Dr. Timmons noted how the Eply maneuver elicited some symptoms of vertigo. (Tr. 410). Neurologic examination showed heel to shin not as good on the left as the right and tandem gait and Rhomberg both negative. (Tr. 410).

On June 26, 2012, Claimant reported last consuming alcohol on July 20, 2004 during follow-up treatment at the Carol Timmons Clinic. (Tr. 404). The neurologic examination showed his affect and mood to be pleasant and conversation appropriate. (Tr. 406). Dr. Timmons performed an Eply Maneuver and instructed Claimant how to do on his own. (Tr. 407). Dr. Timmons opined that part of his dizziness is benign vertigo and recommended that Claimant stop smoking. (Tr. 407).

## IV.   The ALJ's Decision

The ALJ found that Claimant met the insured status requirements of the Social Security Act on March 31, 2012. (Tr. 15). Claimant has not engaged in substantial gainful activity during the period from his alleged onset date of March 15, 2010 through his date of last insured of March 31, 2012. The ALJ found that the medical evidence establishes that Claimant has the severe impairments of a cyst on right temporal lobe with history of complex partial seizures, cochlear noise-induced hearing loss, sleep apnea, headaches, and depression. (Tr. 17). The ALJ found that Claimant's impairments or combination of impairments had not met or medically equaled a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, through the date of last insured. (Tr. 15-16). The ALJ found that through the date of last insured, Claimant had the residual functional capacity to perform light work, except only occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and

crawling; avoid concentrated exposure to excessive noise; avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; avoid commercial driving; limited to occupations that do not require fine hearing capability; and no more than frequent telephone communication; limited to simple, routine, repetitive tasks; superficial interaction with the public and coworkers; and five percent off task during the work period. (Tr. 18).

Through the date of last insured, the ALJ found Claimant unable to perform any past relevant work. (Tr. 24). Claimant is an individual closely approaching advanced age with a limited education and is able to communicate in English. (Tr. 24). Next, the ALJ found considering his age, education, work experience, and residual functional capacity, there are a significant number of jobs in the national and the local economies he could have performed including a bench worker, a polisher, and an assembler. (Tr. 24-25).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-42 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274

F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The claimant's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The claimant's subjective complaints relating to
    exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the
    claimant's impairments.

6.  The testimony of vocational experts when required which
    is based upon a proper hypothetical question which sets forth the claimant's
    impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "if it is supported by substantial evidence on the record as a whole."

Wiese , 552 F.3d at 730 (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).

"Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." Wiese, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. Id. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001), or it might have "come to a different conclusion." Wiese, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." Wheeler v. Apfel, 224 F.3d 891, 894-95 (8th Cir. 2000). See also Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC does not address his symptoms of headaches, blurry vision, nausea, and spacing out on suddenly, irregular intervals. Claimant also contends that the ALJ failed to accord appropriate weight to his treating physician.

## A. Residual Functional Capacity and Credibility Determination

Claimant contends that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ's RFC does not address his symptoms of headaches, blurry vision, nausea, and spacing out on suddenly, irregular intervals.

A claimant's RFC is what he can do despite his limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish his RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 404.1545(a). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id.

The ALJ opined that Claimant through the date of last insured, Claimant had the residual functional capacity to perform light work, except only occasional climbing of ramps and stairs; no climbing of ladders, ropes, and scaffolds; frequent balancing, stooping, kneeling, crouching, and crawling; avoid concentrated exposure to excessive noise; avoid all exposure to hazards such as operational control of moving machinery and unprotected heights; avoid commercial driving; limited to occupations that do not require fine hearing capability; and no more than frequent telephone communication; limited to simple, routine, repetitive tasks; superficial interaction with the public and coworkers; and five percent off task during the work period.

In his decision the ALJ thoroughly discussed the medical evidence of record, his observations at the hearing, the routine and conservative treatment, the gap in treatment, activities of daily living, and inconsistencies in the record. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th

Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The ALJ then addressed several inconsistencies in the record to support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician in any treatment notes stated that Claimant was disabled or unable to work or imposed mental limitations on Claimant's capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012); Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).

Likewise, the ALJ noted how the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment. Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care is not suggestive of disabling pain); Walker v. Shalala, 993 F.2d 630, 631-32 (8th Cir. 1993) (lack of ongoing treatment is inconsistent with complaints of disabling condition). As noted by the ALJ,

the cyst in the temporal region had not increased in size, and numerous neurological examinations showed normal results. Thus the ALJ found that the medical record undermines Claimant's credibility concerning his allegations of disabling pain and disabling impairments. Edwards v. Barnhart, 314 F.3d 964, 968 (8th Cir. 2003) (claimant's failure to pursue regular medical treatment detracted from credibility.). Further, the record does not establish that Claimant did not receive medical treatment because of limited resources.[2] Indeed, the undersigned notes that Claimant reported during treatment how "[h]is lawyer has told him that he needs to go to the Dr. every few months and be seen so his symptoms can be documented over time."

---

[2]Although Claimant claimed that he failed to undergo some treatment because he lost insurance and could not afford the treatment, there is no indication that he ever attempted to receive treatment and was refused due to lack of funds. The record is devoid of evidence suggesting that Claimant was denied treatment offered to indigents. See Nelson v. Sullivan, 966 F.2d 363, 367 (8th Cir. 1992)(holding the mere use of nonprescription pain medication is inconsistent with complaints of disabling pain); Murphy v. Sullivan, 953 F.2d 383, 386-87 (8th Cir. 1992)(finding it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost medical treatment for alleged pain and disability). Except for the notations in the treatment note of November 18, 2010, the record does not document that Claimant was ever refused treatment due to insufficient funds. See Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (recognizing that a lack of funds may justify a failure to receive medical care; however, a plaintiff's case is buttressed by evidence he related of an inability to afford prescriptions and denial of the medication); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999); Murphy, 953 F.2d at 386 (If a claimant is unable to follow a prescribed regimen of medication and therapy to combat his difficulties because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits). The fact that a claimant is under financial strain, however, is not determinative. Id. Here, the record is devoid of any credible evidence showing that Claimant was denied treatment due to lack of finances and thus inferred that Claimant did not seek more frequent medical treatment more often, because he did not have a medical need for such treatment. Case law permits the ALJ's reasonable inferences. See Pearsall v. Massanari, 274 F.3d at 1218. Likewise, the record is devoid of any evidence showing that Claimant had been denied medical treatment or access to prescription pain medications on account of financial constraints. See Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994). In the treatment note of November 18, 2010, Dr. Sahaya opined that to conclusively rule out seizures, he would need to perform CCTV EEG but this is not feasible without any insurance, and he further opined that he has a strong suspicion of panic attacks giving atypical factors for seizure.

The ALJ next noted how the medical record shows an six-month gap in treatment from March until October, 2011 undermines Claimant's credibility concerning his disabling impairments. Edwards v. Barnhart, 314 F.3d 964, 968 (8th Cir. 2003) (claimant's failure to pursue regular medical treatment detracted from credibility). Such gap suggests that Claimant's subjective complaints of disabling pain are not entirely credible. See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995) (citing Benskin v. Bowen, 830 F.2d 878, 884) (8th Cir. 1987) (holding that the "claimant's failure to seek medical treatment for pain" is a legitimate factor for an ALJ to consider in rejecting a claimant's subjective complaints of pain). "[T]he failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain." Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995); see Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 1994) (holding that infrequent treatment is a basis for discounting subjective complaints). Likewise, after receiving treatment on August 31, 2010, he failed to call or show up for follow-up treatment although he was scheduled to return two months later. See Shannon v. Chater, 54. F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem."). Seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991).

Although Claimant testified at the hearing that he constantly experiences a spacey feeling, the ALJ noted Claimant had been able to focus and answer the questions asked. "[An] ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) ((holding that an ALJ "is in the best position" to assess credibility because he is able to observe a claimant

during his testimony); Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("The ALJ's

personal observations of the claimant's demeanor during the hearing [are] completely proper in

making credibility determinations"). See also Lamp v. Astrue, 531 F.3d 629, 632-33 (8th Cir.

2008) (holding that in assessing the plaintiff's allegations of lack of concentration, an impaired

memory, and depression, the ALJ properly combined his review of the record with his personal

observations); Smith v. Shalala, 987 F.2d 1371, 1375 (8th Cir. 1993) (observation by the ALJ that

claimant had not appeared uncomfortable at the hearing was properly considered as detracting

from claimant's credibility). The ALJ's observations of a claimant's appearance and demeanor

during the hearing is consideration in making the credibility determination. Steed v. Astrue, 524

F.3d 872, 876 (8th Cir. 2008) (holding that an ALJ "is in the best position" to assess credibility

because he is able to observe a claimant during his testimony); Johnson v. Apfel, 240 F.3d 1145,

1147-48 (8th Cir. 2001) ("The ALJ's personal observations of the claimant's demeanor during the

hearing is completely proper in making credibility determinations); Jones v. Callahan, 122 F.3d

1148, 1151 (8th Cir. 1997) ("When an individual's subjective complaints of pain are not fully

supported by the medical evidence in the record, the ALJ may not, based solely on his personal

observations, reject the complaints as incredible."). Here, the ALJ combined his review of the

record as a whole with his personal observations. As such, the Court finds that the ALJ's decision

in this regard is based on substantial evidence on the record as a whole.

    The ALJ also properly considered the inconsistencies between Claimant's allegations and

his daily activities. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001)("[i]nconsistencies

between subjective complaints of pain and daily living patterns diminish credibility"); Riggins v.

Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (finding that activities such as driving, shopping,

watching television, and playing cards were inconsistent with the claimant's complaints of disabling pain).  He testified that he likes to garden, leaves the house two to times a week to check on rental property, visits his daughter and wife at work, walks the dog on a nearby hiking trail, cares for the family pets, cooks simple meals, completes light household chores, and exercises by taking short walks.  Another inconsistency in the record would be Claimant's testimony regarding his need to lie down once or twice a day for an hour or two depending on how he feels.  See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) ("[T]here is no medical evidence supporting [the claimant's] claim that she needs to lie down during the day."); Frederickson v. Barnhart, 359 F.3d 972, 977 n.2 (8th Cir. 2004) ("There is no evidence in the record that [the claimant] complained of severe pain to his physicians or that they prescribed that he elevate his foot or lie down daily.").   A review of the record shows he never reported such a need during treatment. Contradictions between a claimant's sworn testimony and what he actually told physicians weighs against the claimant's credibility.  Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006) (finding a lack of credibility when claimant's testimony regarding drinking consumption conflicted with medical documentation).  As such, the undersigned finds that the discrepancies between Claimant's testimony and what he told doctors is supported by substantial evidence.

After engaging in a proper credibility analysis, the ALJ incorporated into Claimant's RFC those impairments and restrictions found to be credible.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record.").  The ALJ determined that the medical evidence supported a finding that Claimant could perform

light work with additional limitations as set forth above. The vocational expert testified in response to hypothetical questions, that incorporated the same limitations as the RFC, and opined that such individual could perform work as bench worker, a polisher, and an assembler.

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support his finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective complaints, including the various factors as required by Polaski, and determined Claimant's allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in making his credibility determination, a reading of the decision in its entirety shows the ALJ to have acknowledged and considered the factors before discounting Claimant's subjective complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a whole, and the ALJ's determination is supported by substantial evidence, such determination should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d 798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before her and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the

record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  The ALJ pointed out

inconsistencies in the record that tended to militate against the Claimant's credibility.  See

Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is

supported by good reasons and substantial evidence).  Those included the medical evidence of

record, his observations at the hearing, the routine and conservative treatment, the gap in

treatment, activities of daily living, and inconsistencies in the record . The ALJ's credibility

determination is supported by substantial evidence on the record as a whole, and thus the Court is

bound by the ALJ's determination.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006);

Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  Accordingly, the ALJ did not err in

discrediting Claimant's subjective complaints of pain.  See Hogan v. Apfel, 239 F.3d 958, 962 (8th

Cir. 2001)(affirming the ALJ's decision that claimant's complaints of pain were not fully credible

based on findings, inter alia, that claimant's treatment was not consistent with amount of pain

described at hearing, that level of pain described by claimant varied among her medical records

with different physicians, and that time between doctor's visits was not indicative of severe pain).

The Eighth Circuit has criticized the failure of the ALJ to consider subjective testimony of

a claimant's family and others.  Robinson v. Sullivan, 956 F.2d 836, 842 (8th Cir. 1992) (holding

that despite Eighth Circuit repeated directives that the Secretary specifically discuss each

credibility determination made, the ALJ failed to state the reasons for discrediting the testimony of

the claimant's wife).  A failure to make credibility determinations concerning such evidence

requires a reversal and remand.  Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984).  However,

while such testimony must be considered, no case directs belief in such testimony as credible.

Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988).

If the ALJ is to reject such testimony, as in the instant case, it must be specifically

discussed and credibility determinations expressed. See <u>Smith</u>, 735 F.2d at 317. The ALJ noted

how Claimant's wife opined extreme limitations of daily living and rejected the same noting how

she is not an acceptable medical source and her opinion is inconsistent with the record as a whole.

See <u>Robinson</u>, 956 F.2d at 841 (a finding concerning the credibility of third party evidence may

involve the same evidence used to find a claimant not credible). In the interrogatories, she noted

that Claimant cannot work due to seizures. To the extent she opined in his ability to engage in

work-related activities, she is not qualified to give an opinion in this regard. See <u>Lorenzen v.</u>

<u>Chater</u>, 71 F.3d 316, 318-19 (8th Cir. 1995) (holding that a claimant's parents were not qualified

to give an opinion regarding her capacity to work). Further, an ALJ may discount the testimony

of a spouse because she has a financial stake in the outcome of the claimant's case. See <u>Choate v.</u>

<u>Barnhart</u>, 457 F.3d 865, 872 (8th Cir. 2006); <u>Rautio</u>, 862 F.2d at 180 (third party testimony not

credible when she lived with plaintiff and had financial interest in case). As such, the undersigned

finds that the ALJ specifically addressed the third-party report os his wife, and that the decision of

the ALJ is supported by substantial evidence.

The substantial evidence on the record as a whole supports the ALJ's decision. Where

substantial evidence supports the Commissioner's decision, the decision may not be reversed

merely because substantial evidence may support a different outcome. <u>Woolf v. Shalala</u>, 3 F.3d

1210, 1213 (8th Cir. 1993) (quoting <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992)).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the

record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this

Court may not reverse the decision merely because substantial evidence exists in the record that

would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

**B.      Weight Given to Treating Doctor**

The undersigned finds that the ALJ considered Dr. Batchu's opinion regarding Claimant's inability to perform even low stress jobs and gave slight weight to his opinion in his written opinion as follows:

> Little weight is accorded to the opinion of Sudhir S. Batchu, MD.... Dr. Batchu reported the claimant has complex partial seizures, which last for a few minutes and result in loss of consciousness. He opined the claimant could not operate machinery, yet he opined the claimant could operate a motor vehicle. Furthermore, Dr. Batchu opined the claimant could not perform even low stress jobs due to headaches, seizures, and problems with cognitive functioning. His opinion is not consistent with the objective results of neurological exams or objective imaging studies, which show benign neurological exam and a temporal cyst that has not changed over time or required surgery..

(Tr. 23) (internal citations omitted).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th

Cir. 2000)).

A treating physician's opinion may be, but is not automatically, entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2). Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. SSR 96-2P, 1996 WL 374188 (July 2, 1996). Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record. Id. "The record must be evaluated as a whole to determine whether the treating physician's opinion should control." Tilley, 580 F.3d at 679. When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010( (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996). SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

Although a treating physician's opinion is often given "controlling weight," such deference is not appropriate when the opinion is "inconsistent with other substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)). The record as a whole in this case, including the inconsistencies in Dr. Batchu's treatment notes and his questionnaire and the medical evidence on record, casts doubt on his assertions that Claimant could not perform low stress jobs.

First, to the extent Dr. Batchu opined that Claimant is incapable of even performing low stress jobs, a treating physician's opinion that a claimant is not able to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion that a claimant is "disabled" or "unable to work" does not carry "any special significance," because it invades the province of the Commissioner to make the ultimate determination of disability). The ALJ acknowledged that Dr. Batchu was a treating source, but that his opinion was not entitled to controlling weight because it is inconsistent with the objective medical evidence in the record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight."). The undersigned notes that Dr. Batchu's opinion is inconsistent with his own treatment notes inasmuch as he never found such functional limitations during treatment. Further, Dr. Batchu last treated Claimant sixteen months before completing the Seizures Residual Functional Capacity Questionnaire at the request of counsel, but he did not report the conditions and symptoms that he claims render him totally disabled.

The ALJ acknowledged that Dr. Batchu was a treating source, but that his opinions were not entitled to controlling weight, because they were inconsistent with the objective medical records. The undersigned notes no examination notes accompanied the December 11, 2011 questionnaire. Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

Second, Dr. Batchu's opinion is inconsistent with his clinical treatment notes. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009). "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes," id., or when it consists of conclusory statements, Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). See also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements."). Dr. Batchu's opinions are not supported by his treatment notes and are conclusory. See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (rejecting claimant's challenge to lack of weight given treating physician's evaluation of claimant's mental impairments when "evaluation appeared to be based, at least in part, on [claimant's] self-reported symptoms, and, thus, insofar as those reported symptoms were found to be less than credible, [the treating physician's] report was rendered less credible."). An ALJ may "discount or even disregard the opinion of a treating physician ... where a treating

physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hackler v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The ALJ properly accorded Dr. Batchu's opinions in the questionnaire little weight inasmuch as his findings were inconsistent with, and unsupported by, the evidence of record. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.") (citation and internal quotation omitted). A review of his treatment notes shows he never imposed any functional limitations or any work restrictions on Claimant. See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]"). Dr. Batchu's treatment notes do not reflect the degree of limitation he noted in his December 11, 2011 questionnaire. The relevant lack of supporting evidence includes the absence of any restrictions placed on Claimant by Dr. Batchu during his treatment of him. See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). The undersigned concludes that the ALJ did not err in affording little weight to Dr. Batchu's opinions of December 11, 2011.

Furthermore, treatment has controlled Claimant's impairments: the objective imaging showed the cyst in the temporal region had not increased in size or any doctor had recommended a surgical intervention. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling.").

Further, no examining physician in any treatment notes stated that Claimant was disabled

or unable to work or imposed mental limitations on Claimant's capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints).  The absence of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints.  Renstrom, 680 F.3d at 1065; Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints).  Thus, the ALJ did not err in giving slight weight to his opinions set forth in the questionnaire.  Renstrom, 680 F.3d at 1065 (ALJ properly gave treating physician's opinion non-controlling weight when that opinion was largely based on claimant's subjective complaints and was inconsistent with other medical experts).  As such, the undersigned finds that the ALJ gave proper weight to Dr. Batchu's opinions.

The undersigned finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo."  Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citation omitted).  "If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits."  Id. (quoting Mapes v. Chater, 82 F.3d

259, 262 (8th Cir. 1996)).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole.  Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that  the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

Judgment shall be entered accordingly.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  23rd   day of January, 2015.